Slip Op. 19-55

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIAXING BROTHER FASTENER CO., LTD., A/K/A JIAXING BROTHER STANDARD PART CO., LTD., IFI & MORGAN LTD., and RMB FASTENERS LTD.,** | |
| **Plaintiffs,** | |
| **and** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Court No. 14-00316** |
| **Defendant,** | |
| **and** | |
| **VULCAN THREADED PRODUCTS INC.,** | |
| **Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the fourth administrative review of certain steel threaded rod from the People's Republic of China.]

Dated: May 9, 2019

Gregory Stephen Menegaz and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, D.C., argued for plaintiffs Jiaxing Brother Fastener Co., Ltd., a/k/a Jiaxing Brother Standard Part Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd. With them on the brief was James Kevin Horgan.

Patricia Mary McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Elizabeth Anne Speck, Senior Trial Counsel. Of Counsel on the brief was Khalil N. Gharbieh, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Roger Brian Schagrin</u>, Schagrin Associates, of Washington, D.C., for defendant-intervenor Vulcan Threaded Products Inc.

Kelly, Judge: This action is before the court on a motion for judgment on the agency record challenging various aspects of the U.S. Department of Commerce's ("Commerce") final determination in the fourth administrative review of the 2009 antidumping duty ("ADD") order on certain steel threaded rod ("STR") from the People's Republic of China ("PRC"). <u>Certain [STR] from the [PRC]: Final Results of [ADD] Admin. Review; 2012-2013</u>, 79 Fed. Reg. 71,743 (Dep't Commerce Dec. 3, 2014) ("<u>Final Results</u>") and accompanying Issues & Decision Mem. for the Final Results of the Fourth Admin. Review of the [ADD] Order on Certain [STR] from the [PRC], A-570-932, (Nov. 21, 2014), ECF No. 23-2 ("Final Decision Memo"); <u>Certain [STR] from the [PRC]: Notice of [ADD] Order</u>, 74 Fed. Reg. 17,154 (Dep't Commerce Apr. 14, 2009).[1]

Plaintiffs Jiaxing Brother Fastener Co., Ltd., (a/k/a Jiaxing Brother Standard Part Co., Ltd.), IFI & Morgan Ltd., and RMB Fasteners Ltd., ("Jiaxing," collectively)[2] contend that Commerce's selection of Thailand as the primary surrogate country for the calculation of the normal value of Jiaxing's STR products is both unsupported by substantial evidence and arbitrary and capricious. <u>See</u> Pls.' Rule 56.2 Mem. In Supp. of J. Upon the Agency R. at 2, 7–29, Apr. 29, 2015, ECF No. 27 ("Pls.' Br."). Plaintiffs also challenge the valuation of Jiaxing's steel wire rod factor of production, brokerage and handling ("B&H")

---

[1] On January 26, 2015, Defendant submitted an indices to the public and confidential administrative record, which can be found at ECF Nos. 23-4–5. <u>See</u> Admin. R., Jan. 26, 2015, ECF No. 23-4–5; <u>see also</u> Am. Admin. R., Jan. 4, 2019, ECF No. 97. All further references to documents from the administrative records are identified by the numbers assigned by Commerce in these administrative indices.

[2] IFI & Morgan Ltd., and RMB Fasteners Ltd., are the affiliated trading companies through which Jiaxing sold the merchandise it produced in the PRC to the United States. <u>See</u> Pls.' Br. at 1 n.1.

costs, and surrogate financial ratios as related to labor, as unsupported by substantial evidence.  Id. at 3–4, 31–45.  For the reasons set forth below, Commerce's selection of Thailand as the primary surrogate country is sustained, as is Commerce's valuation of Jiaxing's steel wire rod factor of production and the selection of the World Bank's "Doing Business 2014: Thailand" report to value B&H costs.   However, Commerce's determination regarding the calculation of the surrogate financial ratios as related to labor is remanded.  Commerce's calculation of B&H costs regarding the 10,000 kilogram weight assigned to 20-foot shipping containers and Commerce's decision not to make adjustments for costs associated with acquiring letters of credit is also remanded.

## JURISIDCTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[3] and 28 U.S.C. § 1581(c) (2012).  Commerce's antidumping determinations must be in accordance with law and supported by substantial evidence.  19 U.S.C. § 1516a(b)(1)(B)(i).

## BACKGROUND

On June 3, 2013, Commerce initiated the fourth administrative review covering the subject merchandise entered during the period of review, April 1, 2012, through March 31, 2013.  Initiation of Antidumping and Countervailing Duty Admin. Reviews and Request for Revocation in Part, 78 Fed. Reg. 33,052 (Dep't Commerce June 3, 2013).  Jiaxing was selected as the single mandatory respondent for this review.  Decision Mem. for

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Prelim. Results of Fourth [ADD] Admin. Review: Certain [STR] from the [PRC] at 2, PD

102, bar code 3202470-01 (May 16, 2014) ("Prelim. Decision Memo").

In the preliminary results, Commerce determined that Colombia, Costa Rica,

Indonesia, the Philippines, South Africa, Thailand, and Ukraine were all countries at the

PRC's level of economic development.  Prelim. Decision Memo at 6–7.  Commerce also

found that Colombia, Costa Rica, Indonesia, the Philippines, South Africa, Thailand, and

Ukraine were all significant producers of comparable merchandise.  Final Decision Memo

at 4.  Commerce then limited consideration to the Philippines, Thailand, and Ukraine, as

the record only contained surrogate value data for these countries.  Id. at 6.

On December 3, 2014, Commerce published the Final Results, selecting Thailand

as the primary surrogate country.  See id. at 5–14.[4]  Commerce ultimately determined

that, while both the Ukrainian and Thai data met its selection criteria, Thailand was

preferable as a primary surrogate country because it offered both suitable surrogate value

data and contemporaneous financial statements.  See id. at 11, 13–14.  Commerce then

calculated surrogate values for Jiaxing's factors of production using data from Thailand,

including generating a surrogate value for Jiaxing's steel wire rod factor of production

through a simple average of three Harmonized Tariff Schedule ("HTS") categories within

the Thai data.  Id. at 17.  Commerce also used Thai data to prepare a surrogate value for

labor input directly associated with manufacturing.  Final Decision Memo at 19–22.  In

preparing the surrogate value of labor, Commerce determined it was not necessary to

make adjustments to avoid double counting labor costs associated with selling, general,

---

[4] In the Final Results, Commerce modified the preliminary dumping margin calculation for Jiaxing on the basis of a revised database submitted by respondents.  See Final Decision Memo at 1.

and administrative costs in the calculation of Jiaxing's surrogate financial ratios.  Id. Commerce also employed the World Bank's "Doing Business 2014: Thailand" report to generate a surrogate value for Jiaxing's B&H costs.  Id. at 23–26; Commerce's Surrogate Values for the Prelim. Results at Ex. 15, PD 104–05, bar codes 3202737-01–02 (May 16, 2014) ("Commerce's Prelim. S. V. Memo").  In computing Jiaxing's B&H costs, Commerce did not make a deduction for the cost of acquiring letters of credit.  Final Decision Memo at 25–26.  Commerce also generated B&H costs on a per-kilogram basis by assigning each shipping container of Jiaxing's STR a weight of 10,000 kilograms.  Id. at 26–28. Jiaxing filed its Complaint on December 10, 2014, and later an amended complaint. Compl., Dec. 10, 2014, ECF No. 10; First Am. Compl., Sept. 21, 2015, ECF No. 41.[5]

## DISCUSSION

Jiaxing alleges that Commerce's selection of Thailand as the primary surrogate country is unsupported by substantial evidence.  Pls.' Br. at 2, 7–29.  Jiaxing further argues that it was arbitrary and capricious for Commerce to find that Thailand provided reliable surrogate value data.  Id. at 2–3, 7–20.  To the extent that Commerce's selection of Thailand as the primary surrogate country is sustained, Jiaxing also challenges the particular use of Thai data to value the steel wire rod factor of production, B&H costs, and surrogate financial ratios as related to labor, as unsupported by substantial evidence.  Id. at 3–4, 31–45.  The court sustains Commerce's selection of Thailand as the primary surrogate country, as well as Commerce's valuation of steel and use of the "Doing Business 2014: Thailand" report to calculate B&H costs.  However, Commerce's calculation of surrogate financial ratios as related to labor, its decision not to adjust B&H

---

[5] On January 30, 2019, the case was reassigned pursuant to 28 U.S.C. § 253(c) and USCIT Rule 77(e)(4).

costs for the costs associated with acquiring letters of credit, and the weight assigned to shipping containers in the calculation of B&H costs are all unsupported by substantial evidence and are remanded for further explanation or reconsideration consistent with this opinion.

### I.  Primary Surrogate Country Selection

Jiaxing challenges Commerce's selection of Thailand as the primary surrogate country as unsupported by substantial evidence because Thailand did not provide the "best available information" as compared with that available from Ukraine and the Philippines.  See Pls.' Br. at 21–31.  Jiaxing further argues that it was arbitrary and capricious for Commerce to find that Thailand provided reliable surrogate value data.  See id. at 8–20.  Defendant argues that there is substantial evidence supporting Commerce's selection of Thailand as the primary surrogate country and that it was not arbitrary and capricious for Commerce to treat the Thai import data as reliable.  See Def.'s Resp. to Pls.' Mot. for J. on the Admin. R. at 7–23, Oct. 9, 2015, ECF No. 45 ("Def.'s Br.").  For the following reasons, Commerce's selection of Thailand as the primary surrogate country is sustained.

Dumping occurs when merchandise is imported into the United States and sold at a price lower than its "normal value," resulting in material injury (or the threat of material injury) to the U.S. industry.  See 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of the merchandise and the U.S. price is the "dumping margin."  See 19 U.S.C. § 1677(35).  When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset

the dumping.  See 19 U.S.C. § 1673; see generally Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010).

Where the exporting country has a nonmarket economy, as in this case, Commerce identifies one or more market economy countries to serve as a "surrogate" and then "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production" in the relevant surrogate country or countries, including "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  See 19 U.S.C. § 1677b(c)(1), (4).  This surrogate value analysis is designed to determine a producer's costs of production as if the producer operated in a hypothetical market economy.  See, e.g., Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1375 (Fed. Cir. 2015).

Commerce must value the factors of production through "the best available information."  19 U.S.C. § 1677b(c)(1).  Commerce has discretion to determine what constitutes the best available information, as this term is not defined by statute.  QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited May 1, 2019).

Using the best available information, Commerce "shall [value the factors of production] to the extent possible . . . in one or more market economy countries that are

– (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4)(A)–(B). The statute does not define "comparable;" nor does it require Commerce to use any particular methodology in determining which countries are sufficiently comparable.

Commerce has a preference to use one primary surrogate country. See 19 C.F.R. § 351.408(c)(2). When several countries are both at a level of economic development comparable to the nonmarket economy country and significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data in the similarly situated surrogate countries and generally selects the one with the best data as the primary surrogate country.[6] Final Decision Memo at 5.

An agency's determination is supported by substantial evidence when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). However, the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

---

[6] Factors of production to be valued in the surrogate market economy "include, but are not limited to – (A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." See 19 U.S.C. § 1677b(c)(3); see generally Dorbest, 604 F.3d at 1367–68. However, valuing the factors of production consumed in producing the subject merchandise does not capture certain items such as (1) manufacturing/factory overhead, (2) selling, general, and administrative expenses, and (3) profit. Commerce calculates those surrogate values using ratios – known as "surrogate financial ratios" – that the agency derives from the financial statements of one or more companies that produce identical (or at least comparable) merchandise in the relevant surrogate market economy country. See 19 C.F.R. § 351.408(c)(4); 19 U.S.C. § 1677b(c)(1); Dorbest, 604 F.3d at 1368.

Nevertheless, "the possibility of drawing two inconsistent conclusions from the evidence does not invalidate Commerce's conclusion as long as it remains supported by substantial evidence on the record." Zhaoqing New Zhongya Aluminum Co. v. United States, 36 CIT __, __, 887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera Corp., 340 U.S. at 488).

On this record, Commerce's selection of Thailand as the primary surrogate country over Ukraine and the Philippines is supported by substantial evidence because Thailand was the only country for which there was specific steel input data as well as contemporaneous financial statements from producers of comparable merchandise. Commerce looked at the available data for low carbon steel wire rod and round bar ("steel wire rod") – Jiaxing's most significant factor of production – and found surrogate value data from both Thailand and Ukraine to be specific. Final Decision Memo at 7–12. Commerce identified the Philippines, Thailand, and Ukraine as economically comparable to the PRC, significant producers of comparable merchandise, and countries for which the record contained surrogate value data. Id. at 6. Commerce found Thai Global Trade Atlas ("GTA") import data to be specific because it was differentiated by carbon content and could be matched to the steel inputs used by Jiaxing. Id. at 10. Commerce found Ukrainian GTA data was not specific because it contained only broad basket categories. Id. However, Jiaxing also supplemented the record with Ukrainian Metal Expert data which Commerce found specific because it covered a carbon content range that matched Jiaxing's steel input. Id. at 11. Commerce determined GTA data from the Philippines was not specific because it grouped together low carbon and mid carbon steel, the latter of which was not used by Jiaxing. Id. at 10.Commerce also found that Thailand provided

multiple contemporaneous financial statements from producers of comparable merchandise. Id. at 13.[7] It found that the financial statements from Ukraine and the Philippines, although from producers of comparable merchandise, were not contemporaneous. Id.

Jiaxing lacks support for its argument that it is inappropriate for Commerce to select Thailand because Thailand "presents by far the most expensive home market"[8] and "no reasonable producer would decide to make Thailand its home market for [STR]."[9]

---

[7] Jiaxing argues that the Ukrainian company's data is superior to that of the Thai companies because the Ukrainian company "not only produced comparable merchandise, but has a similar production experience" to Jiaxing. Pls.' Br. at 29. Jiaxing fails to argue that Commerce's choice is unreasonable. Instead it argues that Commerce should have chosen the Ukrainian data as the best available information. Id. The court will not reweigh the evidence.

Jiaxing further, and incorrectly, claims that the Thai financial statements for Hitech Fastener Manufacture (Thailand) Co., Ltd., ("Hitech") and LS Industries Co., Ltd., ("LS Industries") "include no information on the nature, value, and consumption quantity of the raw materials used in production." Pls.' Br. at 29. Item 14 of Hitech's financial statement – captioned "Cost of production and Costs of sales" – clearly identifies the cost of raw materials used in production. See Petitioner's Submission of Surrogate Value Information at Ex. 15, PD 58, bar code 3177935-05 (Jan. 31, 2014) ("Petitioner's S. V. Submission") (identifying costs for "Materials used" through the addition of "Beginning raw material" and "Purchased materials" minus residual materials at the end of the period). Hitech's statement also contains detailed allocations for costs of production including, among others, "Salary production (Indirect Labor)," "Overtime – Production Department," "Electricity – works," and "Petrol." Id. LS Industries' financial statement provides a comparably detailed breakdown. See Petitioner's S. V. Submission at Ex. 13, PD 58, bar code 3177935-05 (Jan. 31, 2014) ("Details of Cost of Sale"). Commerce's determination that the Thai financial statements "break out the costs" of material, labor and energy was thus reasonable. Final Decision Memo at 13.

[8] Jiaxing supports this claim only by reference to the fact that Ukrainian import prices of low carbon steel are lower than those in the Thai GTA data. See Pls.' Br. at 20.

[9] Jiaxing further argues that Commerce's "complete unpredictability" in primary surrogate country selection in PRC related cases (since shifting away from using India as a surrogate country in 2010) means respondents are "unable to comply with the 'remedial' purpose of the antidumping laws because they cannot reasonably estimate their normal value in the home market." Pls.' Br. at 19. This complaint is unconvincing. Commerce is not required to select the same primary surrogate country in each proceeding. Commerce carries out a separate analysis in each administrative review, which "allows for different conclusions based on different facts in the record." Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1387 (Fed. Cir. 2014).

Pls.' Br. at 20 (emphasis omitted).[10]  In nonmarket economy proceedings Commerce values a respondent's factors of production using the best available information from a country or countries which it considers appropriate.  See 19 U.S.C. § 1677b(c).  There is no requirement that Commerce give weight to a respondent's preference for a primary surrogate country with lower cost factors of production.  See id.  Jiaxing's complaint is based on a misunderstanding of the process by which a primary surrogate country is selected by Commerce and thus fails.  Commerce's selection of Thailand as the primary surrogate country is thus supported by substantial evidence.

Nonetheless, Jiaxing argues that no reasonable mind could conclude that Thailand – as opposed to Ukraine – provides the best available information because the Thai data

---

[10] Jiaxing attempts to support its argument by pointing to the legislative history of the statutory provisions governing the determination of normal value for nonmarket economies, and quotes the Committee on Finance stating that the Senate was "'particularly concerned that imports from certain nonmarket economy countries . . . not be unfairly disadvantaged' by the surrogate methodology."  Pls.' Br. at 19 (quoting S. Rep No. 100-71 at 106 (1987)).  However, the full quote on which Jiaxing seeks to rely is:

> Because the Commerce Department may have difficulties in getting detailed data from countries not subject to investigation, the bill gives the Commerce Department authority to use "comparable merchandise" as the basis for foreign market value. Comparable merchandise is a broader category than the "such or similar" merchandise comparison which is usually used in antidumping investigations. However, in applying this standard, the Commerce Department should make appropriate adjustments to compensate for quality differences in the merchandise under investigation and the comparable merchandise from the benchmark country. The purpose of making such adjustments is to ensure that the foreign market value assigned to the merchandise under investigation fairly reflects any differential due to inferior or superior quality. The Committee is particularly concerned that imports from certain nonmarket economy countries, such as the [PRC], not be unfairly disadvantaged by use of the new methodology where price differences can be accounted for in whole or in part by quality differences in the imported merchandise.

S. Rep. No. 100-71 at 106 (1987).  The excerpt does not provide any indication that Congress intended that nonmarket economy respondents should be allowed to select their own primary surrogate country.  Rather, it gives expression to a particular concern with situations where price differences are attributable to differences in quality.  No party has sought to raise that issue in these proceedings.  Jiaxing's reference to it is thus inapposite.

is aberrational and because Ukraine's Metal Expert data is the "most specific."[11]  Pls.' Br. at 25; see generally id. at 21–25.  Jiaxing argues that Thai steel prices "are well above the prevailing world prices" reported by the World Bank and several other sources, and thus "the Thai steel values must be considered significantly aberrant for this commodity low carbon product."  Pls.' Br. at 24.  However, Jiaxing does not establish that the difference in price between the Thai data and other data on the record is significant enough to be considered aberrational.[12]  As Commerce noted, data is not aberrational simply because it is the lowest or highest data on the record.  See Final Decision Memo at 12 (citing Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States, 37 CIT __, __ n.9, 929 F. Supp. 2d 1352, 1356 n.9 (2013)).  Commerce also found that Jiaxing had not provided it with annual data from prior years to allow it to assess whether the Thai

---

[11] The Ukrainian Metal Expert data contains two separate data sets: (1) Ukrainian domestic prices for steel wire rod 6.5–8 mm in diameter (0.14–0.22 percent carbon) for the period between January 1, 2011 and January 1, 2013; and, (2) prices for wire rod and round bar 6.5–32 mm (0.14–0.22 percent carbon) in Dnepropetrovsk, Ukraine, on a weekly basis for the period between September 2012 and April 2013 and including 20% VAT.  See Jiaxing's Final Surrogate Value Submission at Ex. 6, PD 97, bar code 3195965-01 (Apr. 16, 2014) ("Jiaxing's Final S. V. Submission").  In contrast, the relevant Thai GTA data are average prices across the whole period of review (April 1, 2012 through March 31, 2013) for three HTS categories differentiated by carbon content (containing up to 0.18 percent carbon) (being HTS classification numbers 7213.91.00.10, 7213.91.00.11 and 7213.91.00.12).  See Petitioner's S. V. Submission at Ex. 1, PD 59, bar code 3177935-01 (Jan. 31, 2014).

[12] Thai import prices are identified by Jiaxing as ranging between $840 and $1,140 per metric ton, as against $606 for average Asian prices, and $680–$790 for average world prices.  See Pls.' Reply Brief at 9 (citing Petitioner's S. V. Submission at Ex. 1, PD 59, bar code 3177935-01 (Jan. 31, 2014); Jiaxing's Final S. V. Submission at Exs. 1–2, PD 97, bar code 3195965-01 (Apr. 16, 2014)).  Jiaxing does not point to any previous cases where such price differentials have been indicative of aberrational prices.  The price differential is similar when comparing the Thai GTA data and the Ukrainian Metal Expert data, with the latter providing an average price of $773.388 per metric ton.  See Jiaxing's Final S. V. Submission at Ex. 6, PD 97, bar code 3195965-01 (Apr. 16, 2014).

data was aberrational.  Final Decision Memo at 12.  As such, Jiaxing fails to show that Commerce's determination that the Thai data was not aberrational is unreasonable.[13]

Jiaxing claims further that the Thai data is less specific than the Ukrainian Metal Expert data because it reflects steel wire rod of a "very generic" diameter of less than 14 mm, contains overly fine gradations of carbon that do not "capture [Jiaxing's] purchasing experience," and specifications for silicon and aluminum which are "not known to match [Jiaxing's] steel wire rod inputs."  Pls.' Br. at 22–23.  However, Jiaxing has not supported these assertions with any evidence that these characteristics mean that the Thai data is so unrelated to the low carbon steel wire rod consumed by Jiaxing as to render Commerce's determination that it was specific unreasonable.  It is not this court's role to reweigh the evidence.  Jiaxing's argument fails as it does not establish that the Thai GTA data does not meet Commerce's criteria for specificity or that Commerce's determination is otherwise unreasonable.

Jiaxing also argues that Philippine steel wire rod input data is superior because it is corroborated by world prices for low carbon steel.  Pls.' Br. at 30.  Jiaxing further argues that the fact that the data from the Philippines groups together low carbon and mid carbon steel should not weigh against its specificity because that would only tend to "conservatively overestimate" the surrogate value generated by Commerce, as steel with

---

[13] Likewise, Jiaxing's claim that Ukrainian GTA data is superior because it is specific and non-aberrational fails.  See Pls.' Br. at 24–25.  Jiaxing's purported reliance on Yantai Oriental Juice is similarly inapposite.  Id. at 16–17 (citing Yantai Oriental Juice Co. v. United States, 26 CIT 605 (2002)).  Jiaxing seeks to raise Yantai Oriental Juice for the principle that price distortion by government action is significant regardless of whether it tends to inflate or deflate surrogate prices, and that it is therefore improper for Commerce to disregard the price impact of the behaviors indicated in the Customs Reports.  See Pls.' Br. at 17.  However, this principle is not relevant as Jiaxing has not established that there is any distortion of Thai steel import prices.

higher carbon concentrations tends to be more expensive.  Id.[14]  Neither of these arguments establish that Commerce's selection of Thai data over that of the Philippines is unreasonable.  Thai prices have not been shown to be aberrational and the fact that mid carbon steel could possibly "conservatively overestimate" prices does not show that Commerce's determination regarding the Philippine data's lack of specificity is unreasonable.[15] Commerce's selection of Thailand as the primary surrogate country is supported by substantial evidence.[16]

---

[14] Jiaxing also asserts that the financial statements from the Philippines are superior because they reflect companies that "produce comparable merchandise, consume steel wire rod, and draw wire similar to [Jiaxing's] production process."  Pls.' Br. at 31.  As with Jiaxing's similar claim with respect to the financial statement from the Ukraine, Jiaxing fails to argue that Commerce's choice is unreasonable.  Jiaxing argues, instead, that Commerce should have selected the Philippines statements as the best available information.  The court will not reweigh the evidence.

[15] The Court ordered supplemental briefing on Jiaxing Bro. Fastener Co. v. United States, 822 F.3d. 1289 (Fed. Cir. 2016) ("Jiaxing Bro. Fastener") (involving a challenge by the same plaintiffs to Commerce's determination in the second administrative review of the same [ADD] order at issue here) and its impact on Commerce's selection of Thailand as the primary surrogate country here.  See Order, May 16, 2016, ECF No. 64.  Jiaxing Bro. Fastener relevantly held that Commerce's selection of Thailand over the Philippines as the primary surrogate country was supported by substantial evidence.  See Jiaxing Bro. Fastener, 822 F.3d. at 1300–02.  Both Jiaxing and Defendant argue that the present proceeding concerns different issues to those in Jiaxing Bro. Fastener.  See Def.'s Suppl. Br. Pursuant to this Ct.'s May 16, 2016 Sched. Order at 7–9, June 17, 2016, ECF No. 66; Pls.' Suppl. Br. in Resp. to May 16, 2016 Ct. Order at 8, June 17, 2016, ECF No. 68.  Defendant-Intervenor argues the key issues in relation to the selection of primary surrogate country in Jiaxing Bro. Fastener are "equally applicable" in these proceedings. See Suppl. Br. of Def.-Int. Vulcan Threaded Products, Inc., at 13, June 17, 2016, ECF No. 67. The court agrees that Commerce's selection of Thailand over the Philippines as the primary surrogate country in Jiaxing Bro. Fastener concerned different issues to those in the present proceeding and that consequently Jiaxing Bro. Fastener is not dispositive of the issue of the selection of Thailand as primary surrogate country in present proceedings.

[16] Jiaxing further alleges generally that Commerce failed to adequately consider the arguments raised above in the underlying administrative proceeding.  Pls.' Br. at 7–8.  As is clear from the discussion above, Commerce responded to each of Jiaxing's arguments in turn and Jiaxing has not established that Commerce's conclusions are unreasonable.

Agency action is arbitrary and capricious if "the agency offers insufficient reasons for treating similar situations differently." West Deptford Energy, LLC v. Federal Energy Regulatory Commission, 766 F.3d 10, 21 (Fed. Cir. 2014). A determination is also arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Commerce reasonably found the Thai data reliable. First, Commerce concluded that a 2014 determination that Thai exporters were dumping STR in the United States did not affect the reliability of the Thai import data because the determination only related to Thai exports.[17] Final Decision Memo at 6; see also [STR] from Thailand: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances, 79 Fed. Reg. 14,476 (Dep't Commerce Mar. 14, 2014) ("2014 Thai STR ADD Determination").[18]

---

[17] In selecting the "best available information," Congress has directed Commerce to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R. 3, H.R. Rep. No. 100–576 at 590–91 (1998) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1623–24. In assessing whether such evidence exists, Commerce is not expected "to conduct a formal investigation to ensure that such prices are not dumped or subsidized," but, instead, is to "base its decision [as to whether there is 'reason to believe or suspect'] on information generally available to it at that time." Id.

[18] Jiaxing argues that the 2014 Thai STR ADD Determination constitutes a "reason to believe or suspect" that the price of steel imports into Thailand are distorted. See Jiaxing's Br. at 9–11. This argument relies on an analogy with countervailing duty cases in which Commerce has found substantial government distortion of a market to indicate other prices in that country are unreliable – including import prices. See id. at 10-11 (and administrative determinations cited there). Jiaxing argues this reasoning is "equally applicable in antidumping proceedings" because:

(footnote continued)

Second, Commerce determined that a series of reports and communications which raise concerns about the practices of Thai customs officials (the "Customs Reports") did not constitute specific and objective evidence supporting a reason to believe or suspect that the Thai data as to steel imports were distorted.  See Final Decision Memo at 6–7;

---

Although the antidumping and countervailing laws are separate, and serve some different purposes, there is only one law of economics; and the Department has found as a matter of economic law that a substantial distortion in the market renders all prices within and into that market unreliable. In light of the Department's findings that the principal – if not only major producer in Thailand – of steel threaded rod dumps its merchandise, the entire Thai steel threaded rod market, including relevant imports into Thailand, are not reliable or representative of market prices free from distortion.

Id. at 11.  In making this argument Jiaxing blurs the distinction between antidumping and countervailing duty proceedings.  In fact, Jiaxing has not established that Commerce considers that "as a matter of economic law" any "significant distortion in a market renders all prices within and into that market unreliable."  Id.  Rather, Jiaxing has only established that in certain previous countervailing duty cases Commerce has found a particular market "so dominated by the presence of government" that it concludes "the remaining private prices in the country in question cannot be considered to be independent of the government price."  Id. at 10-11 (quoting Notice of Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 15,545 (Dep't Commerce Apr. 2, 2002).

In preparing the 2014 Thai STR ADD Determination, Commerce did not investigate the Thai steel industry for the presence of subsidies, nor did it otherwise investigate the role of the government in the STR market.  Rather, as the sole mandatory respondent – Tycoons – failed to participate in the administrative proceeding, Commerce adopted the petitioner's valuations of export price and normal value, applying the petitioner's highest rate to Tycoons through an adverse inference and an average to other exporters (Commerce having concluded in the preliminary determination that the petitioner's rates were reliable and sustained this in the final determination).  See Decision Mem. for the Prelim. Determination of the [ADD] Investigation of [STR] from Thailand at 3–7, A-549-831, Dec. 20, 2013, available at https://enforcement.trade.gov/frn/summary/thailand/2013-31341-1.pdf (last visited May 1, 2019).  Commerce did not make a determination as to the provision of government subsidies or market impact in the 2014 Thai STR ADD Determination.  Consequently, the 2014 Thai STR ADD Determination allows for no more than speculation that the prices of steel imported into Thailand are distorted.

Jiaxing further argues that the failure of Tycoons to cooperate in the 2014 Thai STR ADD Determination should itself be taken to indicate that Thailand's import prices are distorted.  See Pls.' Br. at 11–12.  This argument is unconvincing as Tycoons is a private company and its lack of cooperation does not provide evidence of distortion in the prices of upstream products used in the production of STR in Thailand's domestic or import steel prices.  See 2014 Thai STR ADD Determination at 14,477.

see also Jiaxing's Surrogate Country Selection Comments at Exs. 3–9, PD 63–66, bar

codes 3178063-02–04 (Jan. 31, 2014) ("Jiaxing's S. V. Comments").[19]   A "reason to

believe or suspect" must be established by "particular, specific, and objective evidence."

China Nat'l Mach. Imp. & Exp. Corp. v. United States, 27 CIT 255, 266–67, 264 F. Supp.

2d 1229, 1239 (2003).   Commerce concluded that, while the Customs Reports indicated

general concerns as to the practices of Thai customs officials, there was no evidence that

these general concerns had any impact on the specific import data in question.[20]   Final

Decision Memo at 7.   Commerce cited the Xanthan Gum Memo in support of its decision.

---

[19] In an attempt to supplement the Customs Reports, Jiaxing quotes several paragraphs from an additional 2015 report by the United States Trade Representative ("USTR") and provides a website address for the full report.   See Pls.' Reply Br. at 6–7, Nov. 16, 2015, ECF No. 48 ("Pls.' Reply Br.").   This report is not part of the record and will not be considered.

[20] The Customs Reports – being the USTR's annual "National Trade Estimate Report on Foreign Trade Barriers" for the years 2011–2013, a publication by Commerce's U.S. Commercial Service titled "Doing Business in Thailand: 2012 Country Commercial Guide for U.S. Companies," a country profile of Thailand prepared by FedEx in 2013, and two requests for consultation filed with the World Trade Organization ("WTO") in 2008 – all raise concerns about the behavior of Thai customs officials.   See Jiaxing's S. V. Comments at Exs. 3–9, PD 63–66, bar codes 3178063-02–04 (Jan. 31, 2014).   Although there are differences between the USTR's annual reports, each has a substantially similar section on "Customs Barriers" which contains (substantially identical versions of) the following two sentences:

> The United States continues to have serious concerns about the lack of transparency in the Thai customs regime and the significant discretionary authority exercised by Customs Department officials. . . . The U.S. Government and industry also have expressed concern about the inconsistent application of Thailand's transaction valuation methodology and reports of repeated use of arbitrary values by the Customs Department.

Id. at Ex. 3 at 355, Ex. 4 at 369, Ex. 5 at 347.   Commerce's 2012 "Doing Business in Thailand" publication reproduces these lines from the USTR reports almost verbatim.   See id. at Ex. 6 at 77.   The FedEx profile of Thailand reports that Thai customs officials will regularly assess import values through use of an indicative price prepared from the highest declared price of previous shipments of a product instead of the actual transaction value.   See id. at Ex. 9 at 4.   The two requests for consultation filed with the WTO are communications submitted by the EU and the Philippine delegations to the WTO in 2008 alleging that Thailand had since 2006 been applying arbitrary customs values to certain imports of alcoholic beverages and cigarettes.   See id. at Exs. 7–8.   None of these reports raise specific allegations as to the treatment of steel imports into Thailand by the Thai Customs Department.

See Final Decision Memo at 7 (citing Issues & Decision Mem. for the Final Determination of the [ADD] Investigation of Xanthan Gum from the [PRC], A-570-985, (May 28, 2013), available at https://enforcement.trade.gov/frn/summary/prc/2013-13220-1.pdf (last visited May 1, 2019) ("Xanthan Gum Memo")).[21]

      Jiaxing argued that reliance on the Xanthan Gum Memo in this case was inappropriate because the Customs Reports include a number of documents that were not available to Commerce in the Xanthan Gum Memo.  See Pls.' Br. at 15.  Jiaxing's argument fails, however, as Commerce's reference to the Xanthan Gum Memo did not preclude Commerce from considering the additional documents on the record in these proceedings.  Commerce simply stated it could not conclude from the Customs Reports that the "Thai import data under consideration should be rejected as unreliable," and that this conclusion was as "indicated" in the Xanthan Gum Memo.  Final Decision Memo at 7.  Jiaxing has, moreover, not established that the additional documents on the record in these proceedings provide any more persuasive evidence than those considered in the Xanthan Gum Memo.[22]

---

[21] In the Xanthan Gum Memo, Commerce concluded that "while the report from the Office of the [USTR] . . . indicates that the United States has expressed concern over the practices of Thailand's Customs Department officials, we cannot conclude from this report that the entirety of the Thai import data should, therefore, be rejected as unreliable."  Xanthan Gum Memo at 12.

[22] Commerce's conclusion regarding the Customs Reports was not, as argued by Jiaxing, arbitrary and capricious when compared with other determinations excluding export data on the basis of evidence of subsidies.  See Pls.' Br. at 15.  Jiaxing argued that Commerce arbitrarily applied a higher standard of proof regarding the alleged distortion of imports into Thailand than it ordinarily applies regarding allegedly subsidized imports.  Pls.' Br. at 15.  However, the analogy is inapposite as the factual issues raised by the Customs Reports are dissimilar to those raised by subsidized imports.  For example, to support its argument Jiaxing cites to the Stainless Steel Sinks Prelim. Memo.  See Pls.' Br. at 15 (citing Decision Mem. for Prelim. Determination for the

(footnote continued)

Third, Commerce found that a consistent difference between Thai import and export prices for the steel wire rod factor of production was not evidence of customs manipulation.  Final Decision Memo at 7.  Rather, Commerce stated that given the evidence that Thai exporters are dumping steel it was "not surprising that Thai export prices that are tainted with dumping are lower than import prices."  Final Decision Memo at 7.[23]  Commerce's determination therefore is not arbitrary and capricious. The court sustains Commerce's selection of Thailand as the primary surrogate country.

## II. Steel Wire Rod Factor of Production

Having selected Thailand as the primary surrogate country, Commerce calculated the surrogate value of Jiaxing's steel inputs using a simple average of three HTS

---

[ADD] Investigation of Drawn Stainless Steel Sinks from the [PRC] at 17, A-570-983, (Sep. 27, 2012), available at https://enforcement.trade.gov/frn/summary/prc/2012-24549- (last visited May 1, 2019) ("Stainless Steel Sinks Prelim. Memo")).  This is a preliminary antidumping determination in which Commerce stated it would disregard import data relating to products from India, Indonesia and South Korea in the surrogate valuation of stainless steel sinks from the PRC when using Thailand as the primary surrogate country because it had reason to believe or suspect those products were subsidized.  See Stainless Steel Sinks Prelim. Memo at 17.  However, Commerce did not, as Jiaxing alleges, disregard such imports "merely on the fact of one countervailing duty investigation of one product in the past."  Pls.' Br. at 15 (emphasis omitted).  Rather, the evidence Commerce relied upon for disregarding imports from those countries in the Stainless Steel Sinks Prelim. Memo was that it had "found in other proceedings that these countries maintain broadly available, non-industry-specific export subsidies" and that consequently "it is reasonable to infer that all exports from these countries to all markets may be subsidized."  Stainless Steel Sinks Prelim. Memo at 17.  Jiaxing's argument fails because the Customs Reports are not analogous to a prior finding by Commerce that a country maintains broadly available, non-industry specific export subsidies, and thus a comparison of the evidential weight of the two does not indicate that Commerce arbitrarily employed a higher standard of proof in the present case.

[23] In its brief, Jiaxing restates a number of its arguments as to reliability made at the administrative level.  See Pls.' Br. at 7–18; see also Pls.' Reply Br. at 8–14, Nov. 16, 2015, ECF No. 48 ("Pls.' Reply Br.").  Jiaxing argues that the general concerns contained in the Customs Reports establish that the Thai data is unreliable because there is nothing on the record limiting the Customs Reports to a specific import.  See Pls.' Br. at 13; see generally id. 12–18.  Jiaxing also argues that the difference in price between Thai import and export data for steel wire rod should be taken as evidence of customs manipulation.  See Pls.' Reply Br. at 8–14.  Commerce addressed each of these arguments in the underlying administrative proceedings.  Final Decision Memo at 6–7.  The court will not reweigh the evidence.

categories within the Thai data.  Final Decision Memo at 17.  Jiaxing argues that Commerce should instead use a weighted-average to calculate the surrogate value of steel inputs. See Pls.' Br. at 32–33.[24]  Defendant argues that Commerce followed its normal practice in employing a simple average, given that Jiaxing's import and sales data were not reported on a weighted-average basis.  See Def.'s Br. at 25.  The court sustains Commerce's calculation of the surrogate value of Jiaxing's steel inputs.

Commerce concluded it was unable to accurately calculate a weighted-average because Jiaxing's import and sales data were reported on different bases.  Final Decision Memo at 17.  Jiaxing has not established that its import and sales data was reported on a weighted-average basis.  As such, Commerce reasonably employed a simple average in calculating the surrogate value of steel inputs using three Thai HTS categories.

### III. SG&A Labor

Jiaxing argues Commerce double counted SG&A labor costs because Commerce used data to value manufacturing labor costs that included costs associated with SG&A labor.  See Pls.' Br. at 33–36.  Defendant argues Commerce was not required to adjust Jiaxing's surrogate financial ratios because Commerce reasonably concluded the data used to value manufacturing labor did not contain SG&A labor costs.  See Def.'s Br. at 25–27.  For the reasons that follow, the court remands Commerce's calculation of Jiaxing's surrogate financial ratios as related to SG&A labor.

---

[24] In its brief, Jiaxing also argues that Commerce should employ three additional HTS categories from within the Thai data to value Jiaxing's steel input. See Pls.' Br. at 31–32.  During oral argument, however, Jiaxing stated that it wished to waive this argument.  Oral Arg. at 02:05:10–02:06:40, Mar. 15, 2016, ECF No. 62 (citations to the Oral Argument reflect time stamps from the audio recording).

In the calculation of normal value in a nonmarket economy the statute provides for the separate valuation of the "hours of labor required" in producing subject merchandise and of additional expenses (i.e., "general" and "other" expenses).  See 19 U.S.C. § 1677b(c)(3)(A).  In identifying the "hours of labor required" as a factor of production, the statute does not distinguish between labor expended to produce subject merchandise (i.e., "production" labor) and labor expended in performing non-production activities (i.e., "non-production" labor), such as labor associated with the performance of SG&A functions. Id.  Commerce accounts for SG&A costs (including SG&A labor costs) through "surrogate financial ratios" derived from financial statements of companies in the surrogate market economy country.  See 19 C.F.R. § 351.408(c)(4); 19 U.S.C. § 1677b(c)(1); Dorbest, 604 F.3d at 1368.

Commerce may make adjustments to the calculation of surrogate financial ratios to avoid double counting labor costs where the data used to value the labor factor of production includes costs associated with SG&A labor.  See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092 at 36,093–94, (Dep't Commerce June 21, 2011) (stating "the Department will adjust the surrogate financial ratios when the available record information - in the form of itemized indirect labor costs - demonstrates that labor costs are overstated"); see also Issues & Decision Mem. for the Final Determination of the [ADD] Investigation of Drawn Stainless Steel Sinks from the [PRC] at 15, A-570-983, (Feb. 19, 2013), available at https://enforcement.trade.gov/frn/summary/prc/2013-04379-1.pdf (last visited May. 1, 2019) (stating that "because the NSO data include all labor costs, the Department has treated itemized SG&A labor costs in the surrogate financial statements

as a labor expense rather than an SG&A expense, and we have excluded those costs from the surrogate financial ratios."). Double counting is, as a general rule, not permitted because it distorts antidumping margin calculations. See, e.g., DuPont Teijin Films China Ltd. v. United States, 38 CIT __, __, 7 F. Supp. 3d 1338, 1345–46 (2014).

To value labor costs as a factor of production directly associated with manufacturing Jiaxing's STR, Commerce employed data from Thailand's Labor Force Survey of Whole Kingdom published by the National Statistical Office of the Government of Thailand ("NSO Data"). See Final Decision Memo at 19; Commerce's Prelim. S.V. Memo at 6–9, Exs. 7–9. Commerce used the costs of "manufacturing" labor identified in the "Industry" column in Tables 15 and 16 of the NSO Data to derive a single country industry-specific wage rate denominated in US dollars. See Commerce's Prelim. S. V. Memo at Exs. 7A–7B at Tables 15–16.[25] Commerce did not make any adjustments to the calculation of the surrogate financial ratios to avoid double counting SG&A labor costs. See Final Decision Memo at 21. Commerce justified its decision to not make any such adjustments by claiming that the "manufacturing" labor input from the NSO Data did "not include SG&A labor because the labor source identifies individual data line items for 'manufacturing' and 'administrative and support activities.'" Id.

---

[25] The NSO Data covers the third quarter of 2012 and the first quarter of 2013, with such data respectively contained in Exhibits 7A and 7B. See Commerce's Prelim. S. V. Memo at Exs. 7A–7B. These exhibits do not need to be distinguished in this analysis, however, as the structure of the tables contained in them is the same.

Commerce's conclusion is unsupported by substantial evidence as Commerce failed to consider record evidence which supports an alternative conclusion.[26] Commerce did not address Table 8 of the NSO Data, titled "Employed Persons by Occupation and Industry," which lists nine different occupations included within the "manufacturing" industry: (1) legislators, senior officials and managers; (2) professionals; (3) technicians and associate professionals; (4) clerks; (5) service workers and shop and market sales workers; (6) skilled agricultural and fishery workers; (7) craft and related trades workers; (8) plant and machine operators and assemblers; and, (9) elementary occupations. Commerce's Prelim. S. V. Memo at Exs. 7A–7B at Table 8.   The list of occupations included in the "manufacturing" industry in Table 8 of the NSO Data indicates that, in addition to those occupations directly associated with manufacturing ("plant and machine operators and assemblers" and "elementary occupations"), a significant number of individuals in occupations associated with SG&A labor costs are also identified as working in the "manufacturing" industry ("senior officials and managers," "professionals," "technicians and associate professionals," and "clerks").  Id.[27]

The inclusion of occupations not directly associated with manufacturing when calculating the cost of labor directly associated with manufacturing potentially double

---

[26] If Commerce fails "'to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion[,] [the Department's determination is] unsupported by substantial evidence.'"  Ceramark Tech., Inc. v. United States, 38 CIT __, __, 11 F. Supp. 3d 1317, 1323 (2014) (quoting Allegheny Ludlum Corp. v. United States, 24 CIT 452, 479, 112 F. Supp. 2d 1141, 1165 (2000)).  Although Commerce's "explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court."  NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009) (citing State Farm, 463 U.S. at 43).

[27] This interpretation is not excluded by the definition of "Industry" provided in the NSO Data. See Commerce's Prelim. S. V. Memo at Ex. 8B at Item 4.6.  This section defines "Industry" as: "the nature of economic activity undertaken in the establishment in which a person worked or the nature of business in which he was engaged during the survey week."  Id.

counts labor costs associated with SG&A labor.  As Table 18 of the NSO Data shows, the average income of managers, professionals, and technicians is considerably higher than for the plant and machine operators and elementary occupations.  Id. at Table 18 (titled "Employee by Occupation, Income Class"); see also Pls.' Br. at Ex. 3 (summarizing the difference in income of different occupations).  Inclusion of the income of these occupations inflates the cost of manufacturing labor above what manufacturing labor would cost if it was simply derived from the average income of occupations directly associated with manufacturing.

Defendant argues that Commerce's conclusion is reasonable because the category of "administrative and support services" itself also includes low-skilled manual labor such as "plant and machine operators and assemblers" and "elementary occupations."  Def.'s Br. at 26 (citing Commerce's Prelim. S. V. Memo at Ex. 7A at Table 8).  This response is not convincing as it does not detract from the fact that various occupations associated with SG&A labor costs are clearly listed in Table 8 as within the "manufacturing" industry.  Commerce has, consequently, failed to consider record evidence that detracts from Commerce's determination.  See Universal Camera Corp., 340 U.S. at 488.  Commerce's calculation of Jiaxing's surrogate financial ratios as related to labor is thus unsupported by substantial evidence and is remanded for further explanation or reconsideration consistent with this opinion.

## IV. B&H Costs

Jiaxing makes three arguments regarding B&H costs.  First, Jiaxing argues that Commerce unreasonably selected the World Bank's "Doing Business 2014: Thailand" report to value Jiaxing's B&H costs instead of the reported costs of Pakfood Company

Limited ("Pakfood").  See Pls.' Br. at 36–40.  Second, Jiaxing argues that if Commerce is permitted to use the "Doing Business 2014: Thailand" report, it should exclude costs associated with letters of credit in calculating B&H costs.  See id. at 40–42.  Third, Jiaxing argues that Commerce's assumption in the calculation of B&H costs that each shipping container weighs 10,000 kilograms is unsupported by substantial evidence.  See id. at 42–45.  Defendant responds that Commerce properly calculated the surrogate value for B&H costs.  See Def.'s Br. at 27–31.  The court sustains Commerce's reliance on the "Doing Business 2014: Thailand" report to value B&H costs.  However, the court remands Commerce's decision not to make adjustments for costs associated with acquiring letters of credit and the weight assigned to shipping containers in the calculation of B&H costs are unsupported by substantial evidence.

### A. The "Doing Business 2014: Thailand" Report

In calculating normal value, Commerce subtracts "costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser."  19 U.S.C. § 1677b(a)(6)(B)(ii).  The subtraction of these costs from a respondent's normal value is intended to allow a fair comparison to net (or "ex-factory") prices, which are not affected by the extra costs experienced by an exporter in shipping products around the world.  These movement expenses include B&H costs, among others.  Commerce calculates a surrogate value for movement expenses in nonmarket economies.

Commerce valued Jiaxing's B&H costs using the "Doing Business 2014: Thailand" report.[28]  See Final Decision Memo at 23–26; see also Commerce's Prelim. S. V. Memo at Ex. 15.  Commerce selected the "Doing Business 2014: Thailand" report because it was from the primary surrogate country and met "all of the Department's criteria" for surrogate values, including that the data was "only two months outside the [period of review] and . . . based on a broad survey of costs in the Thailand market."  Final Decision Memo at 23.

Commerce reasonably determined that the "Doing Business 2014: Thailand" report constituted the best available information, as compared to the reported B&H costs of Pakfood, because it "reflects a broader experience than simply the experience of a single company."  Id. at 24.[29]  Jiaxing argues that the "Doing Business 2014: Thailand"

---

[28] The "Doing Business 2014: Thailand" report is one of a series of annual reports prepared by the World Bank for various countries which "measures and tracks changes in regulations affecting 11 areas in the life cycle of a business" to show "how easy or difficult it is for a local entrepreneur to open and run a small to medium-size business when complying with relevant regulations." Commerce's Prelim. S. V. Memo at Ex. 15 at 4.  The relevant "Trading Across Borders" section employed by Commerce to prepare Jiaxing's surrogate B&H costs measures the "cost (excluding tariffs and the time and cost for sea transport) associated with exporting and importing a standard shipment of goods by sea transport."  Id. at 72.  For exports, such costs include (1) customs clearance and technical control, (2) ports and terminal handling, (3) inland transportation and handling, (4) bills of lading, (5) certificates of origin, (6) commercial invoices, (7) customs export declaration and (8) terminal handling receipts.  Id. at 78–79.  These costs are derived from questionnaires concerning a standardized case scenario and refer to business in Thailand's largest business city.  Id. at 103.

[29] In its brief, Jiaxing reiterates its argument that Commerce was incorrect to find that the "Doing Business 2014: Thailand" report was based on a broad market average because it is based on contributions from Thailand's largest city, Bangkok.  See Pls.' Br. at 38–39.  Jiaxing argues that a survey based on just one city – as opposed to one based on data points spread across different geographic locations in a country – cannot accurately be described as broad.  Id.  Jiaxing cites Since Hardware (Guangzhou) Co. v. United States, 38 CIT __, 977 F. Supp. 2d 1347 (2014), as a decision in which it had been found that a "broad-based source was one with many data points spread throughout a country."  Pls.' Br. at 38.  This decision is inapposite because it held that due to a factual error Commerce had relied on data based only on one city when the record contained data from 17 cities which together provided a much broader market average.  See Since Hardware (Guangzhou), 38 CIT at __, 977 F. Supp. 2d at 1358.

report is unrepresentative of a broad market average because it is "based upon a hypothetical company's one-time hypothetical shipment of hypothetical merchandise at a hypothetical weight with a hypothetical value." Pls.' Br. at 39. Jiaxing does not, however, substantiate why being "hypothetical" should render the "Doing Business 2014: Thailand" report unrepresentative. Commerce's response to this argument is reasonably discernible from its discussion of the merits of relying on the "Doing Business 2014: Thailand" report over the data from Pakfood. <u>See</u> Final Decision Memo at 24–25. Commerce explained that the Doing Business reports represent a broad market average because they are based on "companies' actual experience" and to prepare them the World Bank gathers "comprehensive quantitative data to compare business regulation environments across economies and over time." <u>Id.</u> at 25. In contrast, Jiaxing's proposed alternative – the reported B&H costs of Pakfood – relies simply on the costs of a single exporter. Commerce's use of the "Doing Business 2014: Thailand" report is thus supported by substantial evidence as Commerce reasonably found that the "Doing Business 2014: Thailand" report was more representative of a broad market average than the alternative. <u>See</u> <u>id.</u>

Although Jiaxing argues that the "Doing Business 2014: Thailand" report is unreliable because it does not specify whether the contributors have any relevant experience, Commerce reasonably inferred that the contributors had relevant experience. Pls.' Br. at 37–38.[30] The World Bank's description of the contributors to the "Doing

_____

[30] Jiaxing also argued that the report does not reflect broad market averages because only two entities contributed information to the relevant chapter (titled "Trading Across Borders"). Pls.' Br.

(footnote continued)

Business 2014: Thailand" report provides a full list of the names of all entities which participated in the report as a whole.  See Attachment to the Record at Ex. 22, PD 157, bar code 3810231-01 (Aug. 18, 2014) ("Doing Business Thailand - Contributors").  The World Bank also provides a separate table identifying the number of contributors specifically relied on by each chapter of the report.  See id., at Ex. 22 at 1.  The table identifying the number of contributors to each chapter of the report does not specify the names of those entities.  See id.  This table makes clear that there were five entities which provided information to the "Trading Across Borders" chapter of the "Doing Business 2014: Thailand" report, but does not provide a means of identifying who specifically these five contributors were.  See id.  As noted by Commerce, however, the report's full list of participants includes freight forwarders, shipping lines, banks, law firms and accounting firms.  Final Decision Memo at 24.  Commerce reasonably inferred that the five contributors to the "Trading Across Borders" chapter were likely to have been those with relevant experience, such as with exporting customers or the freight–forwarding business. See id.  Jiaxing's argument that the contributors may have had no relevant experience thus fails as it is speculative.  See Pls.' Br. at 37.

Nonetheless, Jiaxing contends that it is unreasonable of Commerce to select the "Doing Business 2014: Thailand" report as the best available information to calculate a surrogate value for B&H costs for Jiaxing's STR because there is no raw data from the questionnaires underlying the "Doing Business 2014: Thailand" report.  Pls.' Br. at 36.

---

at 37–38 and Ex. 4.  This claim fails as it was based on a non-contemporaneous version of the webpage describing the contributors to the "Doing Business 2014: Thailand" report.  Id.  The version of the webpage contemporaneous with the administrative review shows five contributors to the "Trading Across Borders" chapter.  See Doing Business Thailand - Contributors at Ex. 22 at 1.

Jiaxing claims this is "a standard that this Court has recently required from the Department as a predicate for relying on Thai surrogate value data sources." Id. (citing Elkay Mfg. Co. v. United States, 38 CIT __, __, 34 F. Supp. 3d 1369, 1382 (2014) ("Elkay I"), and Elkay Mfg. Co. v. United States, 39 CIT __, __, Slip Op. 15-33, 12–13 (Apr. 20, 2015) ("Elkay II")).  However, neither of the opinions cited by Jiaxing support its argument as they do not stand for a proposition that raw survey data is a "predicate for relying on Thai surrogate value data sources."[31]  For the reasons above, Commerce's use of the "Doing Business 2014: Thailand" report to value Jiaxing's B&H costs is supported by substantial evidence.

### B. Letters of Credit

Commerce did not subtract fees for obtaining letters of credit from the B&H costs derived from the "Doing Business 2014: Thailand" report because it concluded that the evidence on the record did not establish that such costs were incorporated into that report. Final Decision Memo at 26.  Commerce's decision is unsupported by substantial evidence because it fails to consider evidence which detracts from its determination, and arbitrary and capricious because it fails to address the inconsistency of its conclusion with past practice.[32]

---

[31] Elkay I held that because the raw survey data were not available, there was no basis in the record to conclude that the value of certain labor data was inflated.  See Elkay I, 38 CIT at __, 34 F. Supp 3d at 1382.  In Elkay II, a motion by the defendant-intervenor for reconsideration of Elkay I was denied, inter alia, because the party had failed to provide sufficient evidence to support its contention that the previous decision in respect of labor data was erroneous.  See Elkay II, 39 CIT at __, Slip Op. 15-33 at 11–14.

[32] Jiaxing claims Commerce's determination of Jiaxing's B&H surrogate value was unsupported by substantial evidence.  See Pls.' Br. at 3–4, 40–42.  However, Jiaxing's argument is, in fact, both that Commerce's determination is unsupported by substantial evidence and that it is arbitrary and capricious.  See id.

It is Commerce's practice to exclude the cost of obtaining letters of credit from the total B&H cost derived from the World Banks's "Doing Business" series "when record evidence can be linked to the specific report" used. Final Decision Memo at 25–26 (citing Monosodium Glutamate From the [PRC]: Final Determination of Sales at Less Than Fair Value and the Final Affirmative Determination of Critical Circumstances, 79 Fed. Reg. 58,326 (Dep't of Commerce Sept. 29, 2014); Monosodium Glutamate from the [PRC]: Issues and Decision Mem. for the Final Determination of Sales at Less Than Fair Value at 9–10, A-570-932, (Sept. 22, 2014), available at https://enforcement.trade.gov/frn/summary/prc/2014-23136-1.pdf (last visited May 1, 2019) ("Monosodium Glutamate Memo")). Commerce may depart from a prior practice so long as it provides a reasoned explanation for its change. See Rust v. Sullivan, 500 U.S. 173, 187 (1991); State Farm, 463 U.S. at 42.

Jiaxing provided correspondence which established that earlier iterations of the World Bank's "Doing Business" series incorporated the costs of acquiring letters of credit and that, at least as of 2011, it was the intention of the World Bank to continue to include the cost of acquiring letters of credit in later publications. See Jiaxing's S. V. Comments at Ex. 20, PD 70, bar code 3178063-09 (Jan. 31, 2014). The first piece of evidence is an email dated April 10, 2013, which provides the "[t]he cost to obtain the export letter of credit" for "the Philippines 2013," "Indonesia 2013," and "Thailand 2013." Id. The second is an email chain from September 2011 which states that the "Doing Business Report – includes the time and cost to obtain a letter of credit." Id. The third is a letter dated September 23, 2011, from a representative of the World Bank who confirms that the cost of obtaining a letter of credit is embedded in the World Bank's "Doing Business" reports.

Id.  The letter states that the "World Bank applies the same methodology in each country and from year to year to ensure that the results are reasonably comparable."  Id.  The letter further states that "the World Bank confirms that the cost of a letter of credit has always been and continues to be included in the reported figures for brokerage and handling."  Id.  Jiaxing's evidence also appears to be consistent with the World Bank's contemporaneous description of the methodology for the "Doing Business 2014: Thailand" report, which states that "the time, cost and documents required for the issuance or advising of a letter of credit are taken into account."  See Attachment to the Record at Ex. A at 1, PD 156, bar code 3798217-01 (2013) ("Trading Across Borders Methodology").

Despite this evidence, Commerce held "there is no information on the record of this administrative review regarding whether the cost of obtaining letters of credit is included in the cost of B&H for Doing Business 2014: Thailand."  Final Decision Memo at 25 (emphasis omitted).  Commerce concluded that it would not adjust the B&H costs in the "Doing Business 2014: Thailand" report because "the record evidence in this review regarding the letter of credit costs refers to Doing Business 2013 but does not specify whether these costs are also included in Doing Business 2014: Thailand."  Final Decision Memo at 26 (emphasis omitted).

Commerce supports its decision through reference to the Monosodium Glutamate Memo, in which Commerce refused to treat the same evidence as submitted in these proceedings (which contains information as to the costs of acquiring letters of credit contained in the "2013 Doing Business: Indonesia" report) as persuasive with respect to the "2014 Doing Business: Indonesia" report.  See Monosodium Glutamate Memo at 9–

10.  However, in the Hardwood and Decorative Plywood Memo, Commerce accepted the same evidence as persuasive with respect to the World Bank's "Doing Business 2013: Bulgaria" report.  See Hardwood and Decorative Plywood From the People's Republic of China: Final Determination of Sales at Less Than Fair Value, 78 Fed. Reg. 58273 (Dep't of Commerce Sept. 23, 2013); [ADD] Investigation of Hardwood & Decorative Plywood from the [PRC]: Issues & Decision Mem. for the Final Determination at 75–76, A-570-986, (Sept. 16, 2013), available at  https://enforcement.trade.gov/frn/summary/prc/2013-23088-1.pdf (last visited May 1, 2019) ("Hardwood and Decorative Plywood Memo").  As the record in the Hardwood and Decorative Plywood Memo only contained information about the cost of acquiring letters of credit for Thailand, the Philippines, and Indonesia, these costs were averaged and deducted from the surrogate B&H costs in the World Bank's "Doing Business 2013: Bulgaria" report.  See Hardwood and Decorative Plywood Memo at 75–76.  These two determinations appear inconsistent and Commerce provides no explanation as to why it previously considered the same evidence persuasive as to reports issued for different countries, but not as to reports issued in different years.

Commerce's determination is unsupported by substantial evidence because it failed to consider record evidence that the "Doing Business" series has the "same methodology in each country and from year to year."  See Jiaxing's S. V. Comments at Ex. 20, PD 70, bar code 3178063-09 (Jan. 31, 2014).  Commerce's decision to not deduct for the cost of acquiring letters of credit was also arbitrary and capricious because Commerce failed to explain the apparent inconsistency with past practice.  On remand, Commerce must reconsider its determination or explain why its conclusion is nonetheless reasonable in light of the record evidence.

### C. Shipping Container Weight

After determining a surrogate B&H cost for each 20-foot shipping container from the "Doing Business 2014: Thailand" report, Commerce calculated a per kilogram B&H cost by assuming that each shipping container contained product weighing 10,000 kilograms. Final Decision Memo at 27–28. Jiaxing argues that Commerce's decision to divide the B&H cost by 10,000 kilograms is unreasonable as the "Doing Business 2014: Thailand" report does not support a conclusion that the typical weight of a 20-foot shipping container is 10,000 kilograms. See Pls.' Br. at 42–43. Defendant responds that Commerce's decision is reasonable because the 10,000 kilogram figure is consistent with the survey data underlying the "Doing Business 2014: Thailand" report. See Def.'s Br. at 30. For the reasons that follow, Commerce's decision is unsupported by substantial evidence.

Commerce generated a surrogate B&H cost for each shipping container of STR shipped by Jiaxing to the United States of $385 by combining the costs for document preparation ($175), customs clearance and technical control ($50), and ports and terminal handling ($160) described as associated with exporting a 20-foot shipping container in the "Doing Business 2014: Thailand" report. See Commerce's Prelim. S. V. Memo at Ex. 12, Ex. 15 at 78; see also Final Decision Memo at 27–28. Commerce then derived a surrogate average per kilogram B&H cost by dividing $385 by 10,000 kilograms. See Commerce's Prelim. S. V. Memo at Ex. 11, Ex. 15 at 78. Similarly, a "[c]ost per kilogram per kilometer" rate was derived for the cost of truck freight using the same 10,000 kilogram figure for each 20-foot shipping container. Id. at Ex. 11. Commerce stated that this 10,000 kilograms figure was selected because it was "the standard cargo weight of a 20-

ft standard container" used in the "Doing Business 2014: Thailand" report.  See id. at Exs. 11–12; see generally Final Decision Memo at 27–28.

The World Bank's contemporaneous description of the methodology for the "Doing Business 2014: Thailand" report states that the report makes certain assumptions about the businesses and traded goods described in the reports to ensure comparability across different economies.  See Trading Across Borders Methodology at Ex. A at 1.  These assumptions include that the product travels in a dry-cargo, 20-foot, full container load, that weighs 10,000 kilograms, and that it is valued at $20,000.  See id.  However, the report provides B&H costs on a "per container" basis.  See Commerce's Prelim. S. V. Memo at Ex. 15 at 75.  The report does not expressly state that B&H costs are dependent on a specific weight of a 20-foot container of goods.  See id. at 72–79.

Commerce stated that it was necessary to assume each shipping container weighs 10,000 kilograms when calculating Jiaxing's B&H costs per kilogram of STR because the survey data underlying the "Doing Business 2014: Thailand" report contained an assumption that a 20-foot container weighed 10,000 kilograms.  Final Decision Memo at 27.  Commerce concluded, then, that to change the weight from 10,000 kilograms would affect the relationship between costs and quantity in the survey data used to prepare the "Doing Business 2014: Thailand" report.  Id. at 27–28.  However, Jiaxing claims that evidence on the record shows that B&H costs are only affected by "whether the container was full or partial."  Pls.' Br. at 43.[33]  In the Final Decision Memo, Commerce did not

---

[33] Specifically, Jiaxing relies on several rate schedules from international freight forwarder Hapag-Lloyd describing the B&H costs of 20-foot and 40-foot containers from Thailand, the Philippines, and Ukraine.  See Jiaxing's Final S. V. Submission at Ex. 16, PD 95, bar code 3195965-04 (Apr.

(footnote continued)

consider this evidence.  Jiaxing's evidence that B&H costs, such as the cost of document preparation, customs clearance and technical control, and ports and terminal handling, are not affected by the weight of a particular shipping container require at least some consideration.  Commerce's conclusion is unsupported by substantial evidence, as it fails to address Jiaxing's evidence that weight is unrelated to B&H costs.  As such, Commerce's decision is remanded for further explanation or reconsideration.

## CONCLUSION

For the reasons set forth above, the Final Results are sustained in part and remanded in part.  Accordingly, it is

**ORDERED** that Commerce's selection of Thailand as the primary surrogate country is sustained; and it is further

---

16, 2014) (providing estimated freight charges from Thailand to the USA for 20-foot and 40-foot shipping containers dated June 24, 2010); Jiaxing's S. V. Comments at Ex. 34, PD 76, bar code 3178063-15 (Jan. 31, 2014) (providing estimated freight charges from the Philippines to the USA for a standard 20-foot shipping container dated December 2, 2011); Jiaxing's S. V. Comments at Ex. 22, PD 69, bar code 3178063-10 (Jan. 31, 2014) (providing estimated freight charges from various Baltic seaports for a "Factory Stuffed" 40-foot shipping container dated March 1, 2013). Jiaxing notes these rate schedules indicate "costs are set per container, percentage or bill of lading." Pls.' Br. at 43.  Jiaxing also observes that a comparison between the charges associated with 20-foot and 40-foot containers in the Hapag-Lloyd rates for Thailand indicates that document charges, bill of lading and carriage fees remain the same, while handling and freight charges increase.  See Pls.' Br. at 43.

Jiaxing also relies on a declaration by the Vice President of Far East American (a company specializing in the importation and distribution of plywood and related wood products from certain countries in Asia) dated June 13, 2013.  See Jiaxing's S. V. Comments at Ex. 31, PD 73, bar code 3178063-14 (Jan. 31, 2014).  The declarant states that in his professional experience he has found "on a global basis brokerage fees are not established with any regard for the actual kilograms or cubic meters actually loaded per container." Id. ¶ 3.  The declarant then goes on to account how he sought to confirm this point through "field research" in the Philippines between May 12, 2013, and May 18, 2013.  See id. ¶¶ 4–10.  The declaration makes reference to the "Doing Business: Philippines 2013" report several times.  See id. ¶¶ 5–6.

**ORDERED** that Commerce's surrogate valuation of Plaintiffs' steel wire rod factor of production is sustained; and it is further

**ORDERED** that Commerce's calculation of Plaintiffs' surrogate financial ratios as related to labor is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's use of the "Doing Business 2014: Thailand" report for the valuation of Plaintiffs' brokerage and handling costs is sustained; and it is further

**ORDERED** that Commerce's determination not to adjust Plaintiffs' surrogate brokerage and handling costs to take into account the cost of acquiring letters of credit is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce's use, in calculating Plaintiffs' brokerage and handling costs, of an assumed weight of 10,000 kilograms for a 20-foot shipping container is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies to comments on the remand redetermination.


                                  /s/ Claire R. Kelly
                                 Claire R. Kelly, Judge

Dated: May 9, 2019
        New York, New York