Slip Op. 20-13

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **JIAXING BROTHER FASTENER CO., LTD. ET AL.,** | |
|       **Plaintiffs,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
|       **Defendant,** | **Court No. 14-00316** |
| **and** | |
| **VULCAN THREADED PRODUCTS INC.,** | |
|       **Defendant-Intervenor.** | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S Department of Commerce's remand redetermination in the fourth administrative review of the antidumping duty order on certain steel threaded rod from the People's Republic of China.]

Dated: February 3, 2020

<u>Gregory S. Menegaz</u> and <u>Alexandra H. Salzman</u>, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiffs Jiaxing Brother Standard Parts Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd.

<u>Joseph H. Hunt</u>, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, and <u>Elizabeth Anne Speck</u>, Senior Trial Counsel. Of Counsel was <u>Vania Wang</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Roger B. Schagrin</u> and <u>Paul W. Jameson</u>, Schagrin Associates, of Washington, D.C., for defendant-intervenor Vulcan Threaded Products Inc.

Kelly, Judge:    Before the court is the U.S. Department of Commerce's ("Department" or "Commerce") remand redetermination filed pursuant to the court's order in Jiaxing Brother Fastener Co., Ltd.,  a/k/a Jiaxing Brother Standard Part Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd. v. United States, 43 CIT __,  380  F.  Supp.  3d 1343 (2019) ("Jiaxing I").  See also Final Results of Redetermination Pursuant to Court Remand, Aug. 27, 2019, ECF No. 105 ("Remand Results").  In Jiaxing I, the court sustained in part and remanded in part Commerce's final determination in the fourth administrative review of the antidumping duty ("ADD") order on certain steel threaded rod ("STR") from the People's Republic of China ("PRC").  See Certain [STR] from the [PRC]: Final  Results  of  [ADD]  Admin.  Review;  2012-2013,  79 Fed.  Reg.  71,743  (Dep't Commerce Dec. 3, 2014) ("Final Results") and accompanying Issues & Decision Memo. for the Final Results of the Fourth Admin. Review of the [ADD] Order on Certain [STR] from the [PRC], A-570-932, (Nov. 21, 2014), ECF No. 23-2 ("Final Decision Memo."); Certain [STR] from the [PRC]: Notice of [ADD] Order, 74 Fed. Reg. 17,154 (Dep't Commerce Apr. 14, 2009).

In Jiaxing I, the court remanded for further explanation or reconsideration its calculation of surrogate financial ratios as related to labor.  380 F. Supp. 3d at 1361–62. The court also ordered Commerce to further explain or reconsider its decision not to adjust costs associated with acquiring letters of credit and the weight assigned to shipping containers in the calculation of brokerage and handling ("B&H") costs.  Id. at 1366–68. On remand, Commerce determined it appropriate to exclude the cost of obtaining letters of credit from the total B&H costs.  See Remand Results at 3.  However, Commerce

declined to reallocate labor expenses in the surrogate financial statements, id. at 11–16, and to adjust the weight assigned to shipping containers in its surrogate value calculation of B&H costs.  Id. at 4–7.

Plaintiffs Jiaxing Brother Fastener Co., Ltd., a/k/a Jiaxing Brother Standard Parts Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd. (collectively, "Jiaxing") challenge Commerce's remand redetermination as unsupported by substantial evidence.  See [Pls.'] Cmts. Opp'n Remand Results at 1, 11, Sept. 27, 2019, ECF No. 109 ("Pls.' Br.").[1] Defendant and Defendant-Intervenor Vulcan Threaded Products Inc. ("Vulcan") request the court to uphold the Remand Results in its entirety.  See Def.'s Resp. Parties' Cmts. on [Remand Results] at 1–2, 15, Nov. 14, 2019, ECF No. 112 ("Def.'s Br."); Def.-Intervenor's Cmts. Supp. Remand Results at 1,4, Nov. 14, 2019, ECF No. 113 ("Def.-Intervenor's Br.").  For the following reasons, the court sustains Commerce's decision not to adjust the surrogate financial statements.  However, the court remands Commerce's calculation of B&H costs regarding its use of a 10,000-kilogram container weight.

## BACKGROUND

The court assumes familiarity with the facts of this case, as set out in the previous opinion, see Jiaxing I, 380 F. Supp. 3d at 1349–50, and recounts those facts relevant to the court's review of the Remand Results.   In this fourth administrative review of the ADD

---

[1] Plaintiffs support Commerce's deduction  of the cost of acquiring letters of credit from B&H costs and present no challenge with respect to that aspect of Commerce's Remand Results.  See Pls.' Br. at 1.

Court No. 14-00316                                                               Page 4

order on certain STR,[2] Commerce selected Thailand as the primary surrogate country, see Final Decision Memo. at 14, and calculated surrogate financial ratios for selling, general, and administrative ("SG&A") costs, manufacturing overhead, and profit using the financial statements of two Thai companies. Id. at 19. Commerce also valued labor hours using data from Thailand's Labor Force Survey of Whole Kingdom published by the National Statistical Office of the Government of Thailand ("NSO data"). Id.; see also Surrogate Values for the Prelim. Results at 6–9, Exs. 7–9, PD 104–05, bar codes 3202737-01–02 (May 16, 2014) ("Prelim. SV Memo").[3] Commerce used the costs of "manufacturing" labor identified in the "Industry" column in Tables 15 and 16 of the NSO data to derive a single country industry-specific wage rate denominated in U.S. dollars. See Prelim. SV Memo. at Exs. 7A–7B at Tables 15–16.[4] In preparing the surrogate value of labor, Commerce determined it was not necessary to re-allocate certain line items in the surrogate financial statements to avoid double counting labor costs associated with SG&A costs in the calculation of Jiaxing's surrogate financial ratios. Final Decision Memo. at 19–22. Commerce also selected the World Bank's "Doing Business 2014:

---

[2] The fourth administrative review covers the period April 1, 2012 through March 31, 2013. See Initiation of Antidumping and Countervailing Duty Admin. Reviews and Request for Revocation in Part, 78 Fed. Reg. 33,052, 33,056 (Dep't Commerce June 3, 2013).

[3] On January 26, 2015, Defendant filed on the docket the indices to the public and confidential administrative records at ECF Nos. 23-4–5. Subsequently, on August 29, 2019, Defendant also filed indices to the public and confidential remand record at ECF Nos. 106-2–3. All further references to documents from the administrative records are identified by the numbers assigned by Commerce in these indices.

[4] The NSO data covers the third quarter of 2012 and the first quarter of 2013, with such data respectively contained in Exhibits 7A and 7B. See Prelim. SV Memo. at Exs. 7A–7B. These exhibits do not need to be distinguished in this analysis, as the structure of the tables contained in them is the same.

Thailand"[5] report ("Doing Business report") to generate a surrogate value for Jiaxing's B&H costs.  Id. at 23–26.  Commerce did not make a deduction for the cost of acquiring letters of credit from the B&H costs derived from that report.  Id. at 25–26.  Commerce also generated B&H costs on a per-kilogram basis by assigning each shipping container of Jiaxing's STR a weight of 10,000 kilograms.  Id. at 27–28.

In Jiaxing I, the court ordered Commerce to reconsider or further explain three aspects of the final determination: (1) Commerce's decision not to subtract the cost of obtaining letters of credit from B&H costs; (2) its decision to calculate B&H with an assumption that each 20-foot shipping container weighs 10,000 kilograms; and, (3) Commerce's decision not to adjust surrogate financial ratios.  See 380 F. Supp. 3d at 1367–68.  First, the court faulted Commerce for failing to address detracting evidence that suggested the Doing Business report incorporates costs of acquiring letters of credit, warranting deduction of those costs from the cost of B&H.  See id. at 1364–66.  The court referred specifically to correspondence that established earlier versions of the Doing Business report incorporated costs of obtaining letters of credit, and, further, the World

---

[5] The "Doing Business 2014: Thailand" report is one of a series of annual reports prepared by the World Bank for various countries which "measures and tracks changes in regulations affecting 11 areas in the life cycle of a business" to show "how easy or difficult it is for a local entrepreneur to open and run a small to medium-size business when complying with relevant regulations."  Prelim. SV Memo at Ex. 15 at 4.  The relevant "Trading Across Borders" section employed by Commerce to prepare Jiaxing's surrogate B&H costs measures the "cost (excluding tariffs and the time and cost for sea transport) associated with exporting and importing a standard shipment of goods by sea transport."  Id. at Ex. 15 at 72.  For exports, such costs include (1) customs clearance and technical control, (2) ports and terminal handling, (3) inland transportation and handling, (4) bills of lading, (5) certificates of origin, (6) commercial invoices, (7) customs export declaration, and (8) terminal handling receipts.  Id. at Ex. 15 at 78–79.  These costs are derived from questionnaires concerning a standardized case scenario and refer to business in Thailand's largest business city.  Id. at Ex. 15 at 102–03.

Court No. 14-00316                                                                              Page 6

Bank's statement that it applied the same methodology in each version of the Doing

Business report.  See id.  Second, the court noted that the Doing Business report provided

B&H costs on a "per container" basis yet did not expressly state that the B&H costs are

dependent on a specific 20-foot shipping container weight.  Id. at 1366–67.  The court

determined that Commerce failed to consider record evidence that indicated that B&H

costs—such as costs of document preparation, customs clearance and technical control,

and ports and terminal handling—are not affected by the weight of a particular shipping

container.  See id.  Third, with respect to surrogate financial ratios, the court explained

that Commerce failed to address record evidence that would indicate an adjustment to

the calculation of financial ratios was necessary to avoid potentially double counting labor

costs associated with SG&A labor.  See id. at 1360–62.  Specifically, the court pointed to

Table 8 of the NSO data that, in listing average wages of occupations within the

"manufacturing" industry, includes several occupations associated with SG&A labor costs

(e.g., "senior officials and managers," "professionals," "technicians and associate

professionals," and "clerks").  Id. at 1361.  The court noted that inclusion of these

occupations inflates the cost of manufacturing labor compared to what manufacturing

labor would cost, if derived solely from average income of occupations directly associated

with manufacturing.  Id.

        On remand, Commerce determined that the costs of obtaining letters of credit

should be excluded from the B&H costs reported in the Doing Business report, and, as a

result, adjusted the B&H surrogate value from $0.0385 to $0.0325 per kilogram.  Remand

Results at 3.  Commerce, however, continued to use a 10,000-kilogram denominator in

the calculation of the B&H surrogate value, because surveyed respondents of the Doing

Business report were asked to provide B&H costs based upon a 20-foot shipping

container weighing 10,000 kilograms.  See id. at 5–7.  With respect to the surrogate

financial ratios, Commerce continued to find no adjustment was warranted, because there

was no basis in the surrogate financial statements themselves that would support

allocating all SG&A labor costs to labor in the calculation of surrogate financial ratios.  Id.

at 12.  Further, Commerce, in reviewing the NSO data, explained that the record evidence

did not provide the necessary information to adjust either the labor wage rate or the

surrogate financial statements.   See id. at 12–16.   As a result of its remand

redetermination, Commerce revised the weighted-average dumping margins assigned to

Jiaxing.  See id. at 2.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii), and 28 U.S.C. § 1581(c) (2012),[6]

which grant the court authority to review actions contesting the final determination in a

review of an antidumping duty order.  The court will uphold Commerce's determination

unless it is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination

pursuant to court remand are also reviewed 'for compliance with the court's remand

order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp.

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19
of the U.S. Code, 2012 edition.

2d 1255, 1259 (2014) (quoting <u>Nakornthai Strip Mill Public Co. v. United States</u>,  32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

### I.  Adjustment of Surrogate Financial Ratios

Jiaxing challenges as unsupported by substantial evidence Commerce's decision not to reclassify as labor certain SG&A labor-related line items[7] in the surrogate financial statement to calculate surrogate financial ratios.  <u>See</u> Pls.' Br. at 7.  Given Commerce had found the NSO data used to value labor included all costs related to labor, Jiaxing further contends that Commerce should have allocated certain SG&A labor-related line items to the denominator of the surrogate financial ratios.  <u>See</u> <u>id.</u>  Jiaxing also argues that Commerce's justifications not to adjust the financial ratios are unsupported by substantial evidence or by its Labor Methodologies.  <u>See</u> <u>id.</u> at 7–8.  Defendant and Defendant-Intervenor respond that Commerce reasonably found it would be inappropriate to adjust the surrogate financial ratios, because no record evidence supported an adjustment and, further, an adjustment would introduce distortions into the surrogate financial ratio calculations.  <u>See</u> Def.'s Br. at 10–15; Def.-Intervenor's Br. at 2–4.  For the reasons that follow, Commerce reasonably declined to adjust the surrogate financial ratios.

---

[7] Specifically, Jiaxing identified in the surrogate financial statements the SG&A labor-related line items as comprising, inter alia, salary and bonus, welfare, social security, and compensation.  <u>See</u> Jiaxing Case Brief at 34–35, Ex. 2, PD 121–25, bar codes 3219798-01–05  (Aug. 4, 2014).

In an antidumping proceeding, if Commerce considers an exporting country to be an NME, like the PRC, it will identify one or more market economy countries to serve as a "surrogate" for that NME country in the calculation of normal value.[8]  See 19 U.S.C. § 1677b(c)(1), (4).   Normal value is determined on the basis of factors of production ("FOPs") from the surrogate country or countries used to produce subject merchandise. See id. at § 1677b(c)(1).  FOPs to be valued in the surrogate market economy include "quantities of raw materials employed," "amounts of energy and other utilities consumed," and, "representative capital cost, including depreciation[,]" and "hours of labor required[.]" See id. at § 1677b(c)(3).  However, the statute does not distinguish between production labor, or labor used to produce subject merchandise, and non-production labor, or labor associated with SG&A functions.  See generally Dorbest Ltd. v. United States, 604 F.3d 1363, 1368 (Fed. Cir. 2010).  Section 1677b requires Commerce to use "the best available information" to value FOPs.   19 U.S.C. § 1677b(c)(1).   Commerce has discretion to determine what constitutes the best available information.  QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review" (collectively, "selection criteria").  Qingdao Sea-Line Trading Co., Ltd. v. United States, 766 F.3d 1378,

---

[8] Dumping occurs when merchandise is imported into the United States and sold at a price lower than its "normal value," resulting in material injury (or the threat of material injury) to the U.S. industry.  See 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of the merchandise and the U.S. price is the "dumping margin." See id. at § 1677(35).  When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset the dumping.  See id. at § 1673; see generally Dorbest, 604 F.3d at 1367.

1386 (Fed. Cir. 2014); see also Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Pol'y Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Jan. 28, 2020). After calculating the total value of FOPs, Commerce will add to normal value "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1).

Thus, Section 1677b(c)(1) provides for the separate valuation of hours of labor as a FOP and of general expenses and profit in the normal value calculation. See 19 U.S.C. § 1677b(c)(1). To value hours of labor, Commerce generally relies on labor costs reported in the International Labor Organization's ("ILO") Chapter 6A data, which captures both direct and indirect labor costs, unless another data source better accounts for those labor costs. See Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg. 36,092 (Dep't Commerce June 11, 2011) ("Labor Methodologies").[9] To value general expenses and profit, Commerce calculates surrogate financial ratios that the agency derives from the financial statements of one or more companies that produce identical or comparable merchandise in the primary surrogate country. See 19 C.F.R. § 351.408(c)(4) (2014);

---

[9] Commerce originally valued labor with ILO Chapter 5B data, which only captured direct labor costs. See Labor Methodologies, 76 Fed. Reg. at 36,093. In its Labor Methodologies, Commerce announced that it would, instead, use ILO Chapter 6A data, because the ILO Chapter 5B data could result in an undercounting of indirect labor costs, if indirect labor costs were not itemized—and reflected in—surrogate financial ratios. See id. However, the effect of switching from data that captured only direct labor costs to a source that reflected both indirect and direct labor costs, could result in an overstatement of labor costs. To minimize this risk, Commerce stated that it will "adjust the surrogate financial ratios when the available record information—in the form of itemized indirect labor costs—demonstrates that labor costs are overstated." Id. at 36,094.

Dorbest, 604 F.3d at 1368.   Specifically, Commerce calculates separate surrogate financial ratios for SG&A, manufacturing overhead, and profit from the surrogate financial statement.   See, e.g., Manganese Metal From the [PRC], 64 Fed. Reg. 49,447, 49,448 (Dep't Commerce Sept. 13, 1999) (final results of second admin. review).   To do so, Commerce analyzes each financial statement line item and either assigns the line item value to a particular category—i.e., raw materials, labor, energy, manufacturing overhead, finished goods, and profit—or excludes the value from its calculation.   Commerce then calculates separate surrogate financial ratios—for manufacturing overhead, SG&A, and profit—based on the total value of each category.   Id.   Relevant here, to calculate the SG&A surrogate financial ratio, Commerce divides the total SG&A value (numerator) by the total cost of manufacturing (denominator), i.e., the sum of raw materials, labor, energy, manufacturing overhead, and finished goods.   See, e.g., Final SV Spreadsheet at Exs. 10A–10B, PD 131, bar code 3243140-01 (Nov. 21, 2014) ("Final SV Spreadsheet").

Commerce will make adjustments to the calculation of surrogate financial ratios to avoid double-counting labor costs, "when the available information—in the form of itemized indirect labor costs—demonstrates that labor costs are overstated."[10] See Labor Methodologies, 76 Fed. Reg. at 36,094; see also Issues & Decision Memo. for the Final Determination of the [ADD] Investigation of Drawn Stainless Steel Sinks from the [PRC] at   15,   A-570-983,   (Feb.   19,   2013),   available   at

---

[10] Generally, double counting is disfavored in antidumping calculations because it is distortive and renders margins less accurate.   See, e.g., Zhaoqing Tifo New Fibre Co. v. United States, 41 CIT __, __ n.8, 256 F. Supp. 3d 1314, 1319 n.8 (2017) (collecting cases).

https://enforcement.trade.gov/frn/summary/prc/2013-04379-1.pdf (last visited Jan. 28, 2020) (stating that "because the NSO data include all labor costs, the Department has treated itemized SG&A labor costs in the surrogate financial statements as a labor expense rather than an SG&A expense, and we have excluded those costs from the surrogate financial ratios").   In such a case, Commerce will determine whether the surrogate financial statements "include disaggregated overhead and [SG&A] expense items that are already included in the [record data used to value labor], [Commerce] will remove these identifiable costs items."   See Labor Methodologies, 76 Fed. Reg. at 36,094.

Here, Commerce valued hours of labor with the NSO data, because it found the data to be more industry-specific and contemporaneous with the POR than the ILO Chapter 6A data.  See Final Decision Memo at 19; Remand Results at 11.   Further, Commerce derived surrogate financial ratios from the financial statements of two Thai companies. See Prelim SV Memo. at 9; Final Decision Memo. at 19–22; Remand Results at 11.   Each company's financial statements itemized SG&A labor-related costs separately from other labor costs.  See Prelim. SV Memo. at 10, Ex. 10.  Commerce treated all SG&A labor-related line items as SG&A, rather than labor.  See Prelim. SV Memo. at 9–10; see also Remand Results at 19–23.  As a result, the numerators of the surrogate financial ratios included SG&A labor line items—e.g., salary, welfare, and social security—along with other SG&A expenses and interest; and, the denominators contained, inter alia, labor costs.  See Final SV Spreadsheet at Exs. 10A–10B.

On remand, Commerce reasonably declined to adjust the surrogate financial ratios to remove SG&A labor-related line items from the numerator because the record did not enable Commerce to determine whether such an adjustment would appropriately compensate for Jiaxing's unreported SG&A labor hours when using the NSO data to value labor hours. See Remand Results at 11–16. As instructed by the court, Commerce reviewed the NSO data, id. at 14–15, and noted that the labor rate represented the average remuneration paid to workers in manufacturing and non-manufacturing activities. Id. at 13–14. In addition, because the NSO data included items like bonus, social security, workmen's compensation fund, and health insurance, Commerce inferred that the labor rate was "likely to be a much broader average than one representing only wages and salaries[.]" Id. at 14. Therefore, Commerce concluded that the NSO data captured all labor costs. Id. at 13–14. Despite determining that the NSO data—like the ILO Chapter 6A data it generally uses to value labor hours—reflected all labor costs, Commerce explained that any adjustment to the surrogate financial ratios—to remove SG&A labor-related line items from the numerator—may not accurately compensate for any potential overstatement of SG&A labor in the NSO data's labor rate.[11] Id. at 14, 16; see also Labor

---

[11] Plaintiffs contend that "there is no reason for the Department to quantify how much the NSO rate is overstated." Pls.' Br. at 8. Although, as Plaintiffs observe, Commerce's Labor Methodologies refers only to overstatement in the respondent's cost of labor, and does not require Commerce to calculate the exact extent of overstatement, see id. at 7–8; Labor Methodologies, 76 Fed. Reg. at 36,093–94, Commerce's determination of whether to adjust surrogate financial statements necessitates quantification on the extent to which the NSO data also captures SG&A labor costs. The difference between production and non-production labor rates in the NSO data could be small, meaning Jiaxing's proposed adjustment to the surrogate financial ratios would result in an understatement of SG&A labor and a less accurate calculation of normal value. Therefore, Commerce reasonably declined to make an adjustment that would potentially create a scenario where indirect labor costs are unrepresented. See Labor Methodologies, 76 Fed. Reg. at 36,093.

Methodologies, 76 Fed. Reg. at 36,093–94.  Commerce explained that the tables in the

NSO report did not provide the information necessary to determine the extent to which

the labor rate captured SG&A labor.[12]  See id. at 13–14.  Therefore, record evidence did

not support a finding that the labor rate was higher—and by what amount—than what it

would have been if derived solely from production labor.[13]  See id. at 14.  Moreover, given

that respondents did not report labor hours associated with SG&A staff, Commerce

reasonably declined to assume that the NSO data would accurately compensate for, and

not overstate, respondents' unreported SG&A labor hours. [14]  See id. at 13–16.  Without

an indication of the extent to which the NSO data also covered SG&A labor, Commerce

reasonably declined to transfer the surrogate financial statements' SG&A labor-related

line items to the denominator in the surrogate financial ratio calculation.[15]

---

[12] In Jiaxing I, the court noted that Table 8 of the NSO data, which lists the number of employees by nine occupations in the "manufacturing" sector, included occupations related to SG&A activities, which may suggest that the NSO data cover indirect labor hours.  380 F. Supp. 3d at 1361. Commerce, on remand, considered Table 8 of the NSO data, but found that it could not discern a relationship between those occupational groupings and the average wages reported in Table 15 that it had used to derive labor hours.  Remand Results at 14–15.  Specifically, Commerce pointed to the mismatch in numbers of persons surveyed in Table 8 compared to Table 15, and noted that the lesser number of persons surveyed in Table 15 rate indicated that some persons surveyed for occupation in Table 8 were excluded from the calculation of the average wage rate.  Id.  The court cannot say that Commerce draws an unreasonable conclusion.

[13] Defendant-Intervenor observes that the number of those employed in the manufacturing industry in Table 8 are "heavily weighted" towards direct manufacturing-related occupations.  See Def.-Intervenor's Br. at 3–4.

[14] Commerce multiplies a respondent's direct and indirect labor hours by the surrogate labor rate, here the NSO data.  See, e.g., Remand Results at 12–13.

[15] In declining to adjust the surrogate financial ratios, Commerce referred to its practice to not "go behind" a surrogate financial ratio.  See Remand Results at 15.  This practice refers to Commerce's preference to accept surrogate financial statement line items as listed to avoid

(footnote continued)

## II. Shipping Container Weight

Jiaxing challenges as unsupported by substantial evidence Commerce's use of a 10,000-kilogram denominator in the surrogate value ("SV") calculation of B&H costs because Commerce fails to acknowledge the "commercial reality" that the cost of shipping a container does not depend on the weight of that container. Pls.' Br. at 1–2. Instead, according to Jiaxing, Commerce should base its calculation of B&H costs on the maximum payload weight of a 20-foot shipping container or the respondent's own container weight. Id. at 6–7. Defendant and Defendant-Intervenor respond that Commerce's decision is reasonable, because the 10,000-kilogram denominator matches the container-weight assumption by which respondents reported costs in the Doing Business report and, moreover, using a different container load would result in a

---

introducing distortions, because Commerce cannot compel a response from the surrogate company, as if it were an interested party to the proceeding, to ask questions or verify information. See Issues and Decision Memo. for the [ADD] Investigation of Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the [PRC]: Final [ADD] Determination at 72, A-570-958, (Sept. 20, 2010), available at https://enforcement.trade.gov/frn/summary/prc/2010-24159-1.pdf (last visited Jan. 28, 2020) (declining to exclude line items when the financial statement did not segregate specific types of expenses); Issues and Decision Memo. for the Final Results of the Admin. Review of the [ADD] Order on Wooden Bedroom Furniture from the [PRC] at 35, A-570-890, (Aug. 5, 2011), available at https://enforcement.trade.gov/frn/summary/prc/2011-20434-1.pdf (last visited Jan. 28, 2020) (declining to adjust financial statements by applying a packing materials ratio when the companies did not separately report a packing material expense); see also Dongguan Sunrise Furniture Co., Ltd. v. United States, 36 CIT 860, 888, 865 F. Supp. 2d 1216, 1244 (2012) (sustaining Commerce's decision not to exclude selling costs from surrogate financial statement to match respondent's exact expenses). However, where there is information on the record to exclude certain expenses to avoid double-counting in the normal valuation calculation, Commerce will exclude those line items. See, e.g., Issues and Decision Memo. for the [ADD] Investigation of Certain Frozen and Canned Warmwater Shrimp from the [PRC] at 55–56, A-570-893, (Nov. 29, 2004), available at https://enforcement.trade.gov/frn/summary/prc/04-26976-1.pdf (last visited Jan. 28, 2020); see also Labor Methodologies, 76 Fed. Reg. at 36,094 ("[W]hen the surrogate financial statements include disaggregated overhead and SG&A expense items that are already included in the ILO's definition of Chapter 6A, Commerce will remove those identifiable cost items.").

mismatch with using B&H values from that report.  Def.'s Br. at 6–7; Def.-Intervenor's Br. at 1–2.  For the reasons that follow, Commerce's decision to apply a 10,000-kilogram denominator is inadequately explained and unsupported by substantial evidence.

In calculating normal value, Commerce subtracts "costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser."  19 U.S.C. § 1677b(a)(6)(B)(ii).  Among the deductions are amounts that represent the costs for B&H export costs and cost of freight.  The subtraction of these B&H costs from a respondent's normal value is intended to allow a fair comparison to net (or ex-factory) prices, which are not affected by the extra costs experienced by an exporter in shipping products around the world.

For the Final Results, Commerce generated a surrogate B&H cost per kilogram for each shipping container of STR shipped by Jiaxing to the United States based on costs associated with exporting a 20-foot, 10,000-kilogram shipping container in the "Doing Business 2014: Thailand" report.  See Final Decision Memo. at 27–28; see also Prelim. SV Memo. at Ex. 12.  First, Commerce added the costs reported "per container" for document preparation ($175), customs clearance and technical control ($50), and ports and terminal handling ($160), totaling $385 as the numerator in its calculation.  See Prelim. SV Memo at Ex. 12, Ex. 15 at 72, 78; see also Final Decision Memo at 27–28.  Commerce then selected 10,000 kilograms to represent container weight for the denominator from a stated assumption in the Doing Business report's methodology by which surveyed respondents provided costs, i.e., that "[t]he traded product travels in a

Court No. 14-00316                                                                Page 17

dry-cargo, 20-foot, full container load . . . [and] weighs 10 tons and is valued at $20,000."[16]
See Final Decision Memo. at 27; see also Ex. A Trading Across Borders Methodology,
Feb. 26, 2019, ECF No. 92-1 ("World Bank Methodology").  Commerce explained that if
it were to use a different container weight, "it would be using a weight unrelated to the
costs reported in Doing Business" that "would yield a distorted result."  Final Decision
Memo. at 27.

On remand, Commerce's continued use of a 10,000 kilogram container weight
from the Doing Business report is not reasonable.  Commerce fails to explain why a
10,000-kilogram container weight relates to B&H costs, when those costs were
specifically catalogued "per container," i.e., based on the broader assumption that the
goods are "transported in a dry-cargo, 20-foot full container load."  See Prelim. SV Memo.
at Ex. 15 at 72, 78.  Further, Commerce does not address detracting evidence that
indicate B&H fees are established by container size and load, rather than by weight.  See
generally Remand Results at 4–7.

The Doing Business report, which provides information on the time and costs
associated with importing and exporting a standardized cargo of goods by sea, fixed
overall parameters to enable standardized comparisons across economies, including the
assumption that "[t]he traded product travels in a dry-cargo, 20-foot, full container load . .
. [and] weighs 10 tons and is valued at $20,000."  See World Bank Methodology.
However, simply because an overall data collection parameter reflects a fixed container
weight does not necessarily mean that surveyed respondents reported information, such

---

[16] Ten tons is approximately 10,000 kilograms.

as B&H costs, by that specific weight to the World Bank.  See Jiaxing I, 380 F. Supp. 3d

at 1367.  Indeed, the Doing Business report catalogues B&H costs more broadly on a

"per container" basis, by container size and load, see Prelim. SV Memo. at Ex. 15 at 72,

78; it does not expressly state that B&H costs are dependent on a specific weight of a 20-

foot container of goods.  Therefore, the "per container" B&H costs may reflect reported

B&H costs for containers that weigh more or less than 10,000 kilograms or cost more or

less than $20,000.  There is no basis in the report for Commerce to assume that a

relationship exists between B&H costs and container weight, when B&H costs were

catalogued by container size and load.  See Remand Results at 5, 7.

Indeed, Plaintiffs placed on the record evidence that suggest container size rather

than weight establishes B&H fees.  That evidence includes information from a Thai

exporter on its incurred B&H costs[17] and B&H rate schedules from an international freight

forwarder Hapag-Lloyd, all indicating that B&H costs are not established on a specific

loaded container weight.[18]  See Pls.' Br. at 5; see also Jiaxing I, 380 F. Supp 3d at 1367

---

[17] Specifically, Jiaxing provided a declaration by the Vice President of Far East American (a
company specializing in the importation and distribution of plywood and related wood products
from certain countries in Asia) dated June 13, 2013.  See Jiaxing SV Info. at Ex. SV-31.  The
declarant states that in his professional experience he has found "on a global basis brokerage
fees are not established with any regard for the actual kilograms or cubic meters actually loaded
per container."  Id. at ¶ 3.  The declarant then recounts how he sought to confirm this point through
"field research" in the Philippines between May 12, 2013, and May 18, 2013.  See id. at ¶¶ 4–10.
The declaration makes reference to the "Doing Business: Philippines 2013" report several times.
See id. at ¶¶ 5–6.

[18] Hapag-Lloyd describes the B&H costs of 20-foot and 40-foot containers from Thailand, the
Philippines, and Ukraine.  See Jiaxing's Final SV Submission at Ex. SV-16, PD 95–98, bar codes
3195965-01–04 (Apr. 16, 2014) (providing estimated freight charges from Thailand to the USA

(footnote continued)

n.33.  To illustrate, Plaintiffs point to Hapag-Lloyd's 20-foot and a 40-foot container freight

charge schedules, which are set per container, per bill of lading, or by percent—not by

weight.  See Pls.' Br. at 3 (citing Jiaxing Prelim. SV Submission at Ex. SV-34, PD 62–80,

bar codes 3178063-01–19 (Jan. 31, 2014) ("Jiaxing SV Info.")).  The document charges

and carriage fees are the same for both container sizes, and the handling and freight

charges increase by container size, not by weight.   See id.  This evidence seems to

indicate that companies are charged by container, and, further, that the B&H costs

reported in the Doing Business report—such as the cost of document preparation,

customs clearance and technical control, and ports and terminal handling—do not relate

to a particular container weight.[19]  Pls.' Br. at 2–5.  Therefore, the Doing Business report

may be read as reporting B&H costs by container—by container size and load—rather

than by weight.

     Defendant points out that Jiaxing proposes to use a different weight of container,

either the maximum payload weight of a 20-foot container or an average weight of

Jiaxing's shipments, neither of which resolve Jiaxing's concern that B&H costs are not

---

for 20-foot and 40-foot shipping containers dated June 24, 2010); Jiaxing SV Info. at Ex. SV-34,
(providing estimated freight charges from the Philippines to the USA for a standard 20-foot
shipping container dated December 2, 2011); Jiaxing SV Info. at Ex. SV-22 (providing estimated
freight charges from various Baltic seaports for a "Factory Stuffed" 40-foot shipping container
dated March 1, 2013).

[19]  The Doing Business report catalogues data on B&H costs "per container."  See Prelim. SV
Memo. at Ex. 15 at 72, 78.  One cannot assume that a parameter by which surveyed respondents
reported data to the World Bank conformed exactly to those parameters, especially when, as
here, there is evidence that indicates shippers do not set B&H costs on container weight.

established on the basis of container weight.[20]    See Def.'s Br. at 8.    Defendant

misconstrues Jiaxing's argument.    Jiaxing proposes these alternatives, because they,

unlike the 10,000-kilogram figure, reflect the "commercial reality" of shippers.    Pls.' Br. at

6–7.    As Plaintiffs explain, the 10,000-kilogram denominator from the Doing Business

report does not relate to Jiaxing's shipped weights.    Id. at 6.    Therefore, Commerce, on

remand, should explain why using a 10,000-kilogram denominator is reasonable, and

support its determination with substantial evidence.[21]

---

[20] Defendant also considers that Jiaxing's reliance on Since Hardware (Guangzhou) Co. v. United States, 38 CIT __, 977 F. Supp. 2d 1347 (2014), and two other cases that apply similar reasoning addressing B&H costs, to be misplaced, because, those cases were concerned with Commerce's presumption that B&H costs increase in proportion to container size or weight.    See Def.'s Br. at 7 (citing DuPont Teijin Films China Ltd. v. United States, 38 CIT __, 7 F. Supp. 3d 1338 (2014); CS Wind Vietnam Co. v. United States, 38 F. Supp. 3d __, 971 F. Supp. 2d 1271 (2014)).    According to Defendant, "proportionality" is not at issue here.    Id.    However, in those cases, Commerce assumed a relationship between container weight and B&H costs.    If such a relationship were to exist, then, as a consequence, B&H costs would increase and decrease in proportion to container weight.    The fact that Commerce selected a fixed container weight does not set this case apart, when, underlying each, is the same assumption that B&H costs relate to container weight.    See Since Hardware, 977 F. Supp. 2d at 1361–63; DuPont Teijin Films China, 7 F. Supp. 3d at 1351–52; CS Wind Vietnam, 38 F. Supp. 3d at 1294–95.

Further, Defendant's assertion that Since Hardware, and this line of cases, does not apply when proportionality is implicated does not find support in its citation to Aristocraft of America, LLC. V. United States, 41 CIT __, 269 F. Supp. 3d 1316 (2017).    In that case, the court distinguished Since Hardware, CS Wind Vietnam Co., and DuPont Teijin Films China factually, given that those actions involved challenges to Commerce's assumptions underlying how respondents shipped their goods.    Aristocraft of America, 269 F. Supp. 3d at 1329–30.    Although the court sustained Commerce's use of a 10,000-kilogram denominator in calculating B&H costs, the plaintiffs did not substantiate their argument that B&H costs and container weight are unrelated.    Id. at 1330.

[21] An agency's determination is supported by substantial evidence when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."    Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).    The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight."    Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

Court No. 14-00316                                                                            Page 21

**CONCLUSION**

For the reasons set forth above, the <u>Remand Results</u> are sustained in part and remanded in part.  Accordingly, it is

**ORDERED** that Commerce's calculation of surrogate financial ratios as related to labor is sustained; and it is further

**ORDERED** that Commerce's determination to adjust Plaintiffs' surrogate brokerage and handling costs to take into account the cost of acquiring letters of credit is sustained; and it is further

**ORDERED** that Commerce's use, in calculating Plaintiff's brokerage and handling costs, of an assumed weight of 10,000 kilograms for a 20-foot shipping container is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies to comments on the remand redetermination.


                     /s/ Claire R. Kelly   
                    Claire R. Kelly, Judge

Dated: February 3, 2020
      New York, New York